UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UT VAN HUYNH, | ) | Case No. 14cv515-BAS (BLM) |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **FOR ORDER DENYING PETITION** |
| v. | ) | **FOR WRIT OF HABEAS CORPUS** |
| DAVID LONG, | ) | [ECF No. 1] |
| Respondent. | ) | |

This Report and Recommendation is submitted to United States District Judge Cynthia A. Bashant pursuant to 28 U.S.C § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.  On February 7, 2014, Petitioner, Ut Van Huynh, a state prisoner proceeding *pro se* and *in forma pauperis*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254.  ECF No. 1 ("Pet.").  Petitioner challenges the validity of his state court conviction for sexual intercourse with a child ten years old or younger.  Id.  Respondent answered on May 14, 2014 [ECF Nos. 13 & 13-1 ("Ans.")] and Petitioner filed a traverse on June 30, 2014 [ECF No. 16 ("Trav.")].

This Court has considered the Petition, Answer, Traverse, and all supporting documents filed by the parties.  For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the California Court of Appeal's opinion in People v. Ut Van Huynh, Appeal No. D062250. See Lodgment 5. This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts are entitled to statutory presumption of correctness).

Huynh lived with his wife and two daughters–L.H., age eight, and her sister, age two–in a one bedroom apartment. His wife worked and went to school, and Huynh worked as a welder at NASSCO. Huynh grew up in Vietnam but had lived in the United States for the previous 22 years working various jobs in the fishing and welding industries.

On May 26, 2011, L.H. approached her second grade teacher, Eleanor Miano during recess. Miano immediately felt something was wrong, as L.H. merely stood at her desk with tears in her eyes. When Miano asked what was wrong, L.H. explained in her limited English that her father was sexually abusing her. L.H. was crying and looked terrified. After it became clear to Miano there was a problem, she notified her principal as well as Child Protective Services. The school nurse then brought L.H. to her office. The nurse noticed L.H. walking gingerly and not being able to sit still. When the nurse asked if L.H. needed to use the bathroom, L.H. pointed to her crotch and said, "Hurt, hurt" and "Daddy hurt." L.H. also made a hand gesture, inserting the pointer finger of one hand into a circle made by the other. When offered water, L.H. said, "Pee hurt. Water bad." When the nurse convinced L.H. to use the restroom, she saw bruises on L.H.'s thigh and arms. She also observed L.H.'s labia appeared as if it had a scarring effect, and her wrists appeared to have scars as if something had been wrapped too tightly around them.

Marilyn Kaufold, M.D., examined L.H. later that evening. Dr. Kaufold observed a bruise on L.H.'s inner thigh and a hyperpigmented band on one of her wrists. Her examination of L.H.'s genitals revealed her structures appeared to be uninjured and age appropriate.

Detective Timothy Williams of the San Diego Police Department interviewed Huynh that same evening. Huynh confessed to putting his "dick" in L.H.'s "pussy" because L.H. wanted his love. He said he told L.H. that if she told her mother, he would send her to Vietnam. Huynh also confessed to a second instance of intercourse with L.H. that happened in the bathroom, but denied any oral copulation. Huynh then wrote two apology letters, one to the police and one to L.H.

A few days later, a forensic interviewer spoke with L.H. L.H. again said Huynh had sexually abused her and gave details of particular instances. Later, in June, L.H. met with a protective services worker, who had L.H.

draw a picture of what worried or scared her. L.H. drew a picture of her father with a penis and herself with a vagina, explaining while she drew that her father had hurt her.

At trial, the prosecution presented the foregoing evidence, along with the testimony of L.H. and various experts. L.H. testified that Huynh had sex with her "a lot" in his bedroom and one time in the bathroom. She also testified that Huynh had her orally copulate him "a lot." L.H. said Huynh continued the abuse even after she told her mother.

Dr. Kaufold testified that in a majority of cases, children who have been sexually abused do not have physical findings upon examination. A forensic child abuse specialist testified that children often delay disclosing their abuse, particularly if they are close to their abuser or if an initial disclosure to a parent does not produce a responsive or protective reaction. She also testified that when children discuss their abuse, they often have difficulty sequencing the events chronologically.

The defense presented the testimony of Raymond Murphy, Ph.D., a psychologist who evaluated Huynh, and Lynne Ticson, M.D., a pediatrician. Dr. Murphy testified that Huynh denied sexually abusing his daughter. Dr. Murphy also testified that Huynh was acquiescent and eager to please, had an I.Q. of 74 in the mild mental retardation range, and was not, in Dr. Murphy's opinion, a pedophile or sexual deviant. Dr. Ticson testified that, in her opinion, sexual penetration of an eight-year-old victim could not happen without physical findings on the child's genital structures.

Lodgment 5 at 3-5.

On November 28, 2011, the District Attorney of San Diego County filed a seven-count information charging Huynh with two counts of sexual intercourse/sodomy with a child 10 years old or younger in violation of California Penal Code ("Penal Code") section 288.7(a), one count of lewd act upon a child in violation of Penal Code section 288(b), and four counts of oral copulation/sexual penetration with a child ten 10 years old or younger in violation of Penal Code section 288.7(b).[1] Lodgment 1 at 7-9.

On April 5, 2012, Petitioner filed a motion to suppress his confession. Id. at 12-24. Petitioner argued that his "Miranda waiver was invalid because he lacked the capacity to knowingly, intelligently, and voluntarily understand his right to remain silent and/or have counsel present before any questioning commenced." Id. at 12. The court denied Petitioner's motion to suppress, "finding by a preponderance of the evidence that the

---

[1] A note on the information indicates that Count 7–oral copulation/sexual penetration with a child 10 years old or younger–was dismissed on May 7, 2012. Lodgment 1 at 9.

defendant voluntarily, knowingly and intelligently waived his rights pursuant to <u>Miranda v. Arizona</u> (1966) 384 U.S. 436" and that Petitioner's statements were "not the product of any coercive questioning or interrogation by law enforcement and were voluntarily provided by [Petitioner]." <u>Id.</u> at 459.

Following a trial, the jury found Petitioner guilty of two counts of the crime of sexual intercourse with a child 10 years old or younger. Lodgment 1 at 403-04. The jury was unable to reach a decision on the remaining counts of lewd act upon a child 14 years old or younger and oral copulation with a child 10 years old or younger. <u>Id.</u> at 407-10. The trial court declared a mistrial as to the remaining counts, and denied Petitioner's motion to dismiss those counts. <u>Id.</u> at 493-94. On June 26, 2012, the trial court sentenced Petitioner to 50-years-to-life.[2] <u>Id.</u> at 433-34.

On June 27, 2012, Petitioner appealed his conviction to the California Court of Appeal, arguing that he was denied his constitutional right to due process and a fair trial when the trial court erroneously denied Petitioner's motion to suppress his statements made to police because Petitioner lacked the capacity to knowingly, voluntarily, and intelligently waive his <u>Miranda</u> rights. Lodgment 3. Petitioner also argued that a sentence of 50-years-to-life violated the ban against cruel and unusual punishment under both the United States and California Constitutions. <u>Id.</u> In an unpublished opinion filed September 17, 2013, the Court of Appeal affirmed the judgment. Lodgment 5. Petitioner subsequently filed a petition for review in the California Supreme Court, raising the same two claims, which was summarily denied on November 26, 2013. Lodgments 6 & 7. Petitioner did not seek habeas corpus relief in state court. On February 7, 2014, Petitioner filed the instant petition asserting the same two claims he raised in his state court appeals. Pet.

## SCOPE OF REVIEW

Title 28 of the United States Code, section 2254(a), sets forth the following scope of

---

[2] Petitioner was sentenced to 25-years-to-life for count one and 25-years-to-life for count two, to run consecutively. Lodgment 1 at 433. For purposes of this Report and Recommendation, the Court will consider Petitioner's sentence as 50-years-to-life.

review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In making this determination, a court may consider a lower court's analysis.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision).  Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely."  Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413).  "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable."  Id. at 75-76 (citations and internal quotation marks omitted).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  Harrington, 131 S.Ct. at 786.  In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); Wood v. Allen, 558 U.S. 290, 293 (2010).  A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court.  See Miller-El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable).  This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007).

## **DISCUSSION**

Petitioner asserts two grounds for relief.  Pet.  First, Petitioner contends that his

constitutional rights to due process and a fair trial were denied when the trial court denied his motion to suppress his confession.  Pet. at 5.  Second, Petitioner alleges that the sentence of 50-years-to-life violates the ban on cruel and unusual punishment under the United States Constitution.  Id. at 5-6.  Respondent contends that the state court reasonably and properly denied Petitioner's claims for relief.  Ans. at 8-20.

**A.     Ground 1-Challenge Based Upon Miranda v. Arizona**

Petitioner alleges in his first claim for relief that the state court erred by determining that he knowingly, voluntarily, and intelligently waived his Miranda rights.  Pet. at 12-13. Petitioner argues that he lacked the capacity to knowingly and intelligently waive his constitutional rights due to his low I.Q. and his lack of understanding of the English language.  Id. at 13-21; Trav. at 3-15, 17-20.  Petitioner additionally alleges that Agent Pham[3] inaccurately translated the Miranda rights so Petitioner did not understand his constitutional rights and could not knowingly waive them.  Id.

Respondent counters that the state courts' determination that Petitioner's Miranda rights were not violated was neither contrary to, nor an unreasonable application, of clearly established federal law, nor was it based on an unreasonable determination of the facts. Ans. at 14-17.  Respondent further argues that the circumstances of Petitioner's initial waiver, as well as Petitioner's sufficient intelligence and understanding of the English language, support the state court's conclusion.  Id.

Petitioner presented this claim to the state supreme court in a petition for review. Lodgment 6.  The petition was summarily denied without a statement of reasoning or citation of authority.  Lodgment 7.  Petitioner presented this claim to the state appellate court in the same manner as it was presented to the state supreme court.  Lodgment 3.  The appellate court denied the claim in a reasoned opinion.  Lodgment 5.  The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion.  Ylst, 501 U.S. at 804.

---

[3] Special Agent Johnson Pham of the United States Department of Homeland Security assisted Petitioner as a Vietnamese interpreter during Petitioner's interview with police. See Lodgment 1 at 80.

1    The California Court of Appeal considered and rejected the claim as follows:

2    After reviewing the recorded interview and transcripts, we conclude the trial
3    court correctly determined Huynh made a knowing and intelligent waiver.
     Huynh's contentions that he lacked the capacity to waive his rights because of
     his low I.Q., his poor English skills, and the inadequate reading and translation
4    of the *Miranda* rights are unavailing. The totality of the circumstances show
     Huynh had sufficient intelligence and understanding of the English language
5    to validly waive his rights, and that the translation of the warnings reasonably
     conveyed his *Miranda* rights.

6

7    Lodgment 5 at 13-14 (footnote deleted).  In reaching this conclusion, the appellate court

8    noted that "[t]hough Huynh's I.Q. and cognitive skills may be below average, they did not

9    impact his capacity to understand and validly waive his *Miranda* rights.  He had lived in the

10   United States for 22 years, had maintained a job as a welder in San Diego, and had held

11   previous welding and fishing jobs around the country.  He had attended school to the 10th

12   grade in Vietnam and obtained technical training here in the United States."  Id. at 15.  The

13   court also found that Petitioner had a sufficient understanding of English because the

14   majority of the interview was conducted in English, Petitioner's responses showed a clear

15   understanding of the substance of the questions, Petitioner used appropriate sexual slang

16   terms without prompting from the officer, Petitioner admitted some conduct while denying

17   other actions, and Petitioner showed an ability to "carry on meaningful conversations in

18   English" with other individuals and at work.  Id. at 16.  Finally, the Court found that Agent

19   Pham "adequately translated" the Miranda rights into Vietnamese and that Petitioner

20   understood the substance of those rights.  Id. at 17-19.

21       Under clearly established federal law, the government may not use a statement made

22   by a suspect during a custodial interrogation unless it establishes that the accused was

23   advised of his constitutional rights and knowingly, voluntarily, and intelligently waived those

24   rights.  Miranda v. Arizona, 384 U.S. 436 (1966).  The suspect must be advised that he has

25   the right to remain silent, that any statement he makes can be used against him, that he has

26   the right to legal counsel, and that he has the right to have legal counsel appointed to

27   represent him.  Id.  at 444.  The Miranda warnings do not have to be given precisely as

28   written in the Miranda decision; rather, the proper inquiry focuses on whether the warnings

given to a suspect "reasonably 'conve[y] to [a suspect] his rights as required by <u>Miranda</u>.'"

<u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989) (quoting <u>California v. Prysock</u>, 453 U.S. 355,

361 (1981)).

     A suspect may waive his <u>Miranda</u> rights but the government must establish that the

waiver was "made voluntarily, knowingly, and intelligently." <u>Miranda</u>, 384 U.S. at 444. This

inquiry has two "distinct dimensions." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Id.</u>; <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 382-83 (2010). In making this evaluation, a court

must consider the "totality of the circumstances including the background, experience, and

conduct of the defendant." <u>United States v. Vallejo</u>, 237 F.3d 1008, 1014 (9th Cir. 2001).

An express waiver is not required; "[w]here the prosecution shows that a <u>Miranda</u> warning

was given and that it was understood by the accused, an accused's uncoerced statement

establishes an implied waiver of the right to remain silent." <u>Berghuis</u>, 560 U.S. at 384.

     The Ninth Circuit recently described the voluntariness inquiry as follows:

> [T]he voluntariness inquiry "is not limited to instances in which the claim is that the police conduct was 'inherently coercive,'" but "applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will. Ultimately, the voluntariness "determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'"
> . . .
>     These principles have particular application where, as here, the individual interrogated is of unusually low intelligence. "What would be over-powering to the weak of will or mind might be utterly ineffective against an experienced criminal." So, although low intelligence does not categorically make a confession involuntary, it is "relevant ... in establishing a setting" in which police coercion may overcome the will of a suspect.

<u>United States v. Preston</u>, 751 F.3d 1008, 1016 (9th Cir. 2014) (citations omitted); <u>see also</u>,

<u>Doody v. Ryan</u>, 649 F.3d 986, 1008-21 (9th Cir. 2011) (finding statement not voluntarily

made by sleep-deprived juvenile who was subjected to extremely lengthy, coercive interrogation).

The appellate court correctly identified <u>Miranda</u> and its progeny as the clearly established federal law.  Lodgment 5 at 11-13.  This Court must therefore examine whether the appellate court reasonably applied the relevant law and made reasonable factual determinations.  28 U.S.C. § 2254(d).

### 1.    The Miranda Advisement

The appellate court rejected Petitioner's contention that he was not properly advised of his <u>Miranda</u> rights.  Lodgment 5 at 17-19.  The court first determined that "the totality of the circumstances show [Petitioner] had sufficient intelligence and understanding of the English language to validly waive his rights."  <u>Id.</u> at 14, 17-19.  The court reviewed the videotaped interview and transcripts and found that Agent Pham explained each constitutional right to Petitioner, that he adequately translated each right into Vietnamese, and that he answered Petitioner's questions regarding his rights.  <u>Id.</u> at 17-19.  The court concluded that "[b]ased upon the totality of the circumstances," Petitioner was adequately informed of his constitutional rights.  <u>Id.</u> at 19.

This Court has reviewed the transcript of Petitioner's interview and finds that it supports the state courts' decisions.  Initially, Detective Williams accurately told Petitioner "[y]ou have the right to remain silent."  Lodgment 1 at 110.  Agent Pham accurately translated this right into Vietnamese as "You have the right not to answer.  You have the right to remain silent."  <u>Id.</u>  Petitioner then asks whether that right means that "if he asks me anything I don't have to answer, right?" and Agent Pham responds "That's correct."  <u>Id.</u>  The detective then accurately states the next right, "If you give up the right to remain silent, anything you do say can and will be used in court against you."  <u>Id.</u>  That right also is translated into Vietnamese and when Petitioner indicates he does not understand that right, Agent Pham explains, "Whatever you answer to him, he can use it in court, do you understand?"  <u>Id.</u>  Petitioner then asks, "No, at the what?" and Pham responds "in court" and Petitioner replies "alright."  <u>Id.</u> at 110-11.

Detective Williams then accurately states the next two rights relating to Petitioner's right to speak with an attorney before and during questioning and to have an attorney appointed for him if he cannot afford to hire one.[4]  Id. at 111.  When Petitioner again indicates his lack of understanding, Agent Pham explains "[y]ou have the right to hire or to retain a lawyer to talk to and answer the questions he will ask before he asks" and "[i]f you have no money, the government will hire a lawyer for you and you do not pay any money for the lawyer."  Id.  After both of these explanations, Detective Williams asked Petitioner whether he understood his rights.  Id. at 111-12.  Petitioner initially indicated that he did not understand all of his rights and stated that he "didn't go to school" and "didn't study" the law.  Id at 112.  Detective Williams and Agent Pham told Petitioner that they must explain the rights to Petitioner before they can speak with him "about what's taking place."  Id. at 112-13.  Petitioner then states that he understands and is willing to talk about the case.[5]  Id. at 113.

Petitioner contends that Agent Pham did not accurately translate the Miranda rights into Vietnamese and that when the flawed translation is combined with Petitioner's low intelligence, it reveals that Petitioner did not understand his constitutional rights.  Pet. at 12-21.  Petitioner specifically asserts that he did not understand that he had the right to remain silent and that he had a right to a free attorney before and during questioning.  Id. at 16, 18-19; Trav. at 9-11.

A review of the record establishes that the detective and agent properly advised Petitioner of his Miranda rights.  Although Petitioner challenges the adequacy of the

---

[4] The detective stated "you have the right to speak with an attorney of your choice before I, before questioning and to have the attorney present during questioning" and "[i]f you cannot afford an attorney, one will be appointed for you by the court prior to any questioning if you so desire.  The attorney will not cost you anything, those services are free."  Lodgment 1 at 111.

[5] The transcript provides the following: Detective, "Alright, okay.  But I"m trying to explain to you that before I can talk to you about what's taking place" Petitioner, "Yeah." Detective, "…I have to tell you what your rights are." Petitioner, "Oh, okay." Agent Pham, "Before asking you, he wants to advise you of your rights." Petitioner, "Yeah." Agent Pham, "Do you understand?" Petitioner, "Yes." Detective, "Okay, So do you understand?" Petitioner, "Yeah." Detective, "Okay. Are you willing to talk to me about the case?" Petitioner, "Yeah."  Lodgment 1 at 112-13.

advisement that he had the right to remain silent, the record establishes that Detective Williams and Agent Pham accurately told him about this right and that Petitioner verified his knowledge by stating, "if he asks me anything I don't have to answer, right?" and Agent Pham replied "That's correct."  Lodgment 1 at 110.

Petitioner also challenges the adequacy of the right to counsel advisement, claiming that he did not understand that he had the right to a free attorney before and during questioning. Pet. at 17-19; Trav. at 9-13.  Again, the record refutes this contention. Detective Williams properly advised Petitioner of his rights in this regard in English. Lodgment 1 at 109.  The Vietnamese translation, while not ideal, adequately advised Petitioner that he had the right to talk to an attorney before answering any questions asked by the detective and that the government will pay for the attorney if Petitioner does not have the money to do so. Id.  Taken together, these statements advised Petitioner that he had the right to speak with an attorney before answering the detective's questions, to have an attorney present during questioning, and that if he could not afford to hire an attorney, the government would pay for the attorney.  Thus, there is substantial support for the appellate court's conclusion that Detective Williams and Agent Pham adequately advised Petitioner of all of his Miranda rights.  See United States v. Milton, 2010 WL 762184, *4 (D. Nev. March 4, 2010) (upholding state court's conclusion that Miranda advisement was adequate where petitioner was told he had right to speak with an attorney but was not specifically told that he had the right to have the attorney present during the interrogation).

There also is substantial support in the trial record for the court's conclusion that Petitioner understood his rights.  Initially, it is undisputed that Detective Williams properly advised Petitioner of his Miranda rights in English.  As discussed in more detail below, the record provides substantial support for the appellate court's conclusion that Petitioner understood English sufficiently well to understand and waive his Miranda rights in English. Moreover, the Vietnamese translation, while not perfect, adequately conveyed the essence of the rights to Petitioner and was not affirmatively misleading in any way.  As such, there

1   is support for the court's conclusion that Petitioner understood his <u>Miranda</u> rights.   <u>See</u>
2   <u>United States v. Botello-Rosales</u>, 2009 WL 3734117 (D. Or. Nov. 6, 2009) (denying motion
3   to suppress statements where defendant advised of <u>Miranda</u> rights in English and Spanish
4   and English recitation was complete and accurate and Spanish translation was adequate and
5   noting that defendant had lived in the United States for 16 years, admitted he understood
6   English, and answered many questions before the Spanish translation was completed);
7   <u>Prysock</u>, 453 U.S. at 360-61 ("nothing in the warnings given … suggested any limitation on
8   the right to the presence of appointed counsel different from the clearly conveyed rights to
9   a lawyer in general, including the right 'to a lawyer before you are questioned, … while you
10  are being questioned, and all during the questioning.'").; <u>cf.</u> <u>United States v. San Juan-Cruz</u>,
11  314 F.3d 384, 387-88 (9th Cir. 2002) (finding <u>Miranda</u> advisement and waiver insufficient
12  where government agent presented defendant with two versions of the <u>Miranda</u> rights and
13  they conflicted with each other in material ways).

14          **2.      The Miranda Waiver**

15          Petitioner argues that as a result of his low I.Q. and "poor grasp of the English
16  language," he "lacked the capacity to knowingly and intelligently waive his constitutional
17  rights."   Pet. at 12; Trav. at 3-13.   Initially, the appellate court acknowledged that "the
18  validity of a <u>Miranda</u> waiver depends upon the totality of the circumstances," including "the
19  defendant's age, education experience, intelligence, mental and physical condition at the
20  time of questioning, and familiarity with law enforcement."   Lodgment 5 at 13.   The court
21  concluded that "[t]hough [Petitioner's] I.Q. and cognitive skills may be below average, they
22  did not impact his capacity to understand and validly waive his <u>Miranda</u> rights."   <u>Id.</u> at 15.
23  In reaching this decision, the court considered all of the relevant facts and noted Petitioner's
24  education, employment history, understanding of and ability to carry on a conversation in
25  the English language, and length of time residing in the United States.   <u>Id.</u> at 13-16.

26          Again, there is ample evidence in the record to support the appellate court's
27  conclusions that Petitioner's low I.Q. and cognitive ability and limited English skills did not
28  prevent him from understanding and validly waiving his <u>Miranda</u> rights.   First, as noted by

the appellate court, the majority of Petitioner's interview occurred in English.  Lodgment 1 at 87-186.[6]  Detective Williams asked questions in English and Petitioner answered them in English with responses that showed he understood the English question.  Id.  For example, the vast majority of the preliminary questions and answers were in English and Petitioner spoke in English on several topics.  Id. at 87-106.  During this time, Petitioner independently confirmed that Agent Pham spoke Vietnamese (id. at 93) and then when he had trouble describing one of his tattoos, asked Agent Pham in Vietnamese for the correct English word (id. at 96).

Similarly, after the Miranda advisement and waiver, Petitioner answered the majority of the detective's questions in English and used Agent Pham to translate for him when Petitioner felt it was necessary.  Id. at 111-86.  Petitioner's responses showed a clear ability to communicate in English and there were few instances in which Petitioner needed the Vietnamese translation.  Id.  As noted by the appellate court, Petitioner used English slang sexual terms correctly, without prompting from the detective.  Id. at 125, 129.  Moreover, the record establishes that Petitioner did not merely answer yes to all of the detective's questions; Petitioner explained what he did to his daughter and why, mostly in his own words in English.  Id. at 125-54.  Also, Petitioner specifically denied engaging in certain sexual acts, even though Detective Williams indicated he thought Petitioner had engaged in the identified sexual acts.  Id. at 132-33 (denying both oral and anal sex); 140-41, 147 (explaining that he did not ask for oral sex during the incident they currently were discussing).

Second, there is substantial evidence to support the appellate court's conclusion that while Petitioner's "I.Q. and cognitive skills may be below average, they did not impact his capacity to understand and validly waive his Miranda rights" because, among other things, Defendant had lived in the United State for 22 years, had held several jobs, including many years as a welder, and had obtained a 10th grade education in Vietnam and technical

---

[6] The interview transcript also is contained in Lodgment 1, pages 248-348.

training in the United States.  Lodgment 5 at 15.  The trial record supports the court's factual findings.  Petitioner stated during his interview that he was 45 years old and that he works for a NASSCO contractor as a welder on a Navy ship.  Lodgment 1 at 89-90.  He also identified other companies for whom he had worked.  Id. at 92.  Petitioner stated that he was born in Vietnam, lived in Thailand in the 1980s, and has lived in the United States since the late 1980s, working several different jobs.  Id. at 95-99.  The psychologist retained by Petitioner stated in a report that Petitioner went to school for 10 years (through the 10th grade) in Vietnam and obtained technical training in welding in the United States, specializing in "mig and stick welding."  Id. at 27-28.  Petitioner told the psychologist that he initially worked in Seattle and Alaska in the fishing business, but he then moved to Louisiana where he "studied welding and was trained in the shipyards."  Id. at 28.  Petitioner reported that he has worked in the welding field since that training and that for the last nine years he has worked for NASSCO Ship Building.  Id.  The psychologist repeated many of these facts during his trial testimony.  Lodgment 2 at 470-87.  In addition, the victim's school teacher testified that Petitioner introduced himself to her in English and that the few conversations they had were in English.  Lodgment 2 at 234-37.

Accordingly, the record establishes that while his I.Q. was 74, Petitioner was educated through the tenth grade in Vietnam, received additional specialized technical training in the United States, and was able to communicate in English and conduct many aspects of his daily living in English.  In addition, although a Vietnamese interpreter was available to Petitioner throughout the interview, Petitioner answered the vast majority of Detective Williams' questions in English, without the use of the interpreter.  From this evidence, the court of appeals properly could find that Petitioner understood his rights and knowingly and intelligently waived them.  See Medrano v. Ryan, 2012 WL 682417, *10 (D. Ariz. March 2, 2012) (upholding state court's determination that petitioner knowingly and intelligently waived his Miranda rights despite I.Q. of 75 where he "functioned adequately in society for many years," attended high school, and worked as a laborer and salesman); Vallejo, 237 F.3d 237 F.3d at 1014-15 (upholding validity of Miranda waiver where defendant was adult

1  man whose first language was Spanish but who answered most of the agent's questions in

2  English where a Spanish interpreter was available during the interrogation).

3       Moreover, the record establishes that Detective Williams and Agent Pham adequately

4  conveyed to Petitioner all of his Miranda rights in a straight-forward manner.  They did not

5  attempt to downplay the significance of the rights, imply that the rights are mere formalities

6  or mutually beneficial to both Petitioner and the government, or indicate the right to counsel

7  was only available to people involved in a crime.  See Doody, 649 F.3d at 1002-06 (finding

8  these facts important in determining that juvenile did not knowingly and voluntarily waive

9  his Miranda rights).  Similarly, Petitioner was a 44 year old man, who had lived and worked

10 in the United States for many years, not a juvenile or young man who lacked sophistication

11 and therefore was in need of "special caution."  Id. at 1008-09 citing In re Gault, 387 U.S.

12 1, 45 (1967) ("The Supreme Court "has emphasized that admissions and confessions of

13 juveniles require special caution."); Preston, 751 F.3d at 1020 (evaluating confession of 18

14 year old man, with an I.Q. of 65, whose initial responses to officers "gave them cause to

15 believe that he had a[] [mental] impairment]").

16      While Petitioner does not explicitly challenge the voluntariness of his waiver and

17 subsequent statements, the Court notes that the Ninth Circuit has recently emphasized that

18 a defendant's I.Q. and mental capabilities bear directly on voluntariness.  Preston, 751 F.3d

19 at 1016 ("We begin with "[c]onsideration of [Preston's] reduced mental capacity," a factor

20 that is critical because it [may] render[] him more susceptible to subtle forms of coercion.").

21 Here, while Petitioner has a low I.Q. of 74 (Lodgment 1 at 30), it is above the level generally

22 considered to constitute mental retardation.  Medrano, 2012 WL 682417, *10 (citing Perry

23 v. Lynaugh, 492 U.S. 302, 308 n.1 (1989)).  In addition, Petitioner was able to hold a steady

24 job for nine years, live and work in the United States for 20+ years, and converse in English.

25 A review of the interview transcript shows that Detective Williams did not utilize coercive

26 questioning techniques and the interview was not lengthy.   Lodgment 1 at 87-186.

27 Moreover, while Petitioner's psychologist argued that Petitioner confessed in an effort to

28 please the officers, the record establishes that Petitioner repeatedly denied engaging in

specific sexual acts, despite the detective's indication that there was evidence that he had committed the acts.  Accordingly, there is substantial evidence to support the conclusion that the waiver was voluntary, despite Petitioner's low I.Q., and that his will was not overborne by the detective's questions.  See Preston, 751 F.3d at 1016-17; Doody, 649 F.3d at 1008-21.

As set forth above, the appellate court applied the correct law and there is ample evidence in the trial record supporting the appellate court's conclusion that Petitioner was adequately advised of his Miranda rights and that he knowingly, intelligently and voluntarily waived those rights.  Under AEDPA's highly deferential standard for evaluating state court rulings, this Court finds that the state court's decision was not "objectively unreasonable." See Richter, 131 S.Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."); Williams, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable.").  This Court therefore **RECOMMENDS** that Petitioner's claims in Ground 1 be **DENIED**.

## B.   Ground 2-Cruel and Unusual Punishment

Petitioner argues that his sentence of 50-years-to-life is cruel and unusual punishment in violation of the Eighth Amendment.[7]  Pet. at 25-32.  Petitioner contends that the sentence is grossly disproportionate to the crimes of conviction because he has no prior criminal history and the lengthy sentence is more appropriate for a murder conviction.  Id. at 29-30. Respondent counters, in agreement with the Court of Appeal, that Petitioner's sentence does

---

[7] Petitioner also argues that the sentence violates the California Constitution. Pet. at 25.  The appellate court rejected this argument and this challenge is not cognizable in a federal habeas petition.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Higgens v. Hedgpeth, 2010 WL 1904866, *20 n.6 (E.D. Cal. May 10, 2010) (finding petitioner's claim that his sentence violated the California constitution was not cognizable in a federal habeas petition).

not interfere with the United States Constitution due to the gravity of Petitioner's conviction of two counts of sexual intercourse with a child under the age of ten.  Ans. at 20.

Because the California Supreme Court summarily denied Petitioner's petition for review on direct appeal (Lodgment 7), this Court must look through to the Court of Appeal's decision as the last reasoned state court decision on this claim.  See Ylst, 501 U.S. at 801-06.  In considering Petitioner's claim based on the United States Constitution, the court correctly  stated the applicable federal law:

> The Eighth Amendment to the United States Constitution, which applies against the states under the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 962.) This includes not only punishments that are barbaric, but also those that "are disproportionate to the crime committed." (*Solem v. Helm* (1983) 463 U.S. 277, 284.)  While strict proportionality between the crime and punishment is not required, the Eighth Amendment forbids "extreme sentences that are 'grossly disproportionate to the crime." (*Harmelin v. Michigan, supra*, at p. 1001 (conc. Opn. Of Kennedy, J.), citing *Solem v. Helm, supra*, at pp. 288, 303.)  Successful proportionality challenges to noncapital punishment sentences are "'exceedingly rare.'" (*Rummel v. Estelle* (1980) 445 U.S. 263, 374.)

> In *Solem*, the United States Supreme Court set out a three-prong test similar to the one adopted in California to address claims of disproportionate sentences:

> "[A] court's proportionality analysis under the Eighth Amendment *should* be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem v. Helm, supra*, 463 U.S. at p. 292.)

> However, the Court subsequently restricted this test, stating the comparative analyses of the second and third prongs is appropriate only when the analysis of the first prong "leads to an inference of gross disproportionality." (*Harmelin v. Michigan, supra*, 501 U.S. at p. 1005.)

Lodgment 5 at 26-27.  The Court then incorporated its analysis under the California Constitution and stated that "Huynh's crimes were particularly grave; sexual intercourse with a child under 10 is severe enough in and of itself, but Huynh's crime is compounded by his abuse of the father-daughter relationship.  Thus, we conclude his sentence was not grossly disproportionate to his crime." Id. at 27.

The Eighth Amendment provides that cruel and unusual punishments shall not be inflicted.  U.S. Const. Amend. VIII.  A criminal sentence constitutes cruel and unusual punishment if it is grossly disproportionate to the crimes committed.  Lockyer v. Andrade, 583 U.S. 63, 71 (2003).  The Court stated that in evaluating "term of years sentences," such as the one at issue in this case, a reviewing court must consider "all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive."  Graham v. Florida, 560 U.S. 48, 59 (2010).  The Court emphasized that this analysis "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime."  Id. at 60. The Court explained that in determining  whether a sentence is grossly disproportionate, the analysis

> must begin by comparing the gravity of the offense and the severity of the sentence…. [I]n the rare case in which [this] threshold comparison … leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions….  If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.

Id. (citations omitted).  The Ninth Circuit has observed that "the precise contours of this principle are unclear, and it has been applied only in exceedingly rare and extreme circumstances."  Crosby v. Schwartz, 678 F.3d 784, 791 (9th Cir. 2012).

Because the appellate court correctly identified and utilized the appropriate federal law, this Court only is required to determine whether the state court's decision was "'contrary to or involved an unreasonable application of' this clearly established gross disproportionality principle."  Lockyer, 538 U.S. at 73.  Initially, the Court notes that Petitioner has not identified any case that indicates that a 50-years-to-life sentence, consisting of two consecutive 25-years-to-life sentences, for two counts of sexual intercourse with a child under the age of ten is a grossly disproportionate sentence.  Rather, a review of cases in the Ninth Circuit reveals that numerous courts have upheld the constitutionality of similar sentences for similar sexual misconduct crimes. See Higgins, 2010 WL 1904866, *20-21 (E.D. Cal. May 10, 2010)(denying Eighth Amendment challenge to sentence of 32-

years-to-life imposed on 68 year old man with no criminal record or history of violence for seven counts of child molestation of two or more victims); Garcia v. Knipp, 2011 WL 7299662, *4-5 (C.D. Cal. Oct. 26, 2011) (denying constitutional challenge where defendant with no prior convictions sentenced to a total of 45-years-to-life for six counts of committing a lewd act upon a child under 14 years of age); Lawrence v. Ryan, 2011 WL 41906, *1-2 (D. Ariz. Jan. 6, 2011) (upholding constitutionality of 39 year sentence for three counts of sexual conduct with a minor under 14 years of age imposed on 29 year old man); United States v. Shill, 2012 WL 6569394, *4-7 (D. Or. Dec. 17, 2012) (denying constitutional challenge to imposition of ten year mandatory sentence on man convicted of attempting to entice a 16 year old girl to have sex with him); Cordeiro v. Hernandez, 2011 WL 1626577, *15-16 (S.D. Cal. April 27, 2011) (rejecting Eighth Amendment challenge to 75-years-to-life sentence after conviction for two counts of lewd and lascivious acts upon a minor, one count of indecent exposure, and one count of child annoyance, and an additional ten years for two serious felony priors); Norris v. Morgan, 622 F.3d 1276, 1290-96 (9th Cir. 2010) (finding sentence of life without the possibility of parole not "grossly disproportionate" when applied to man convicted of one count of child molestation (touching child's genitalia over clothes for a few seconds) when the defendant had a prior conviction for child molestation); Crosby v. Schwartz, 678 F.3d 784, (9th Cir. 2012) (finding no Eighth Amendment violation for sentence of 26-years-to-life for two violations of the sex offender registration requirements under California's Three Strikes Law).

Second, there is ample law and facts supporting the appellate court's decision.  The initial analysis requires a court to consider the gravity of the offense and the severity of the sentence.  Graham, 130 S.Ct. at 2021.  The appellate court found that the crimes of conviction were "particularly grave" and "compounded by [Petitioner's] abuse of the father-daughter relationship." Lodgment 5 at 27.  In reaching this conclusion, the court noted that the victim was only eight years old, that the acts of intercourse occurred in the family home, that both the victim and Petitioner acknowledged that the intercourse caused her pain, that Petitioner threatened to send the victim to Vietnam if she told her mother about the

intercourse, and that the crimes have detrimentally affected the victim's self-esteem, performance at school, and peace of mind.[8]  Id. at 20, 23.  The appellate court's factual summary is supported by the trial record. Lodgment 1 at 128, 133-35,  (Petitioner's statement); Lodgment 1 at 709-13 (foster parents' statements); Lodgment 2 at 115-29 (testimony of a family friend); Lodgment 2 at 190-202, 209-13, 217-22 (victim L.H.'s statements); Lodgment 2 at 237-39 (testimony of L.H.'s teacher); Lodgment 2 at 518 (Petitioner's psychologist's testimony).  As such, there is ample evidence supporting the conclusion that the crimes were "particularly grave."  Because the crimes are particularly grave, the fact that the sentence is severe[9] does not establish any type of disproportionality and certainly not gross disproportionality.

This conclusion is supported by federal law.  In Norris, 622 F.3d at 1293, the Ninth Circuit concluded that sentence of life imprisonment was not a grossly disproportional sentence for a recidivist defendant who touched a five year old girl's genitalia over her clothes for a couple of seconds.   In reaching this conclusion, the Court found that the crime was a crime of violence and noted that "[t]he impact of [child molestation] on the lives of [its] victims is extraordinarily severe."  Id. at 1294.  Clearly, the instant case, which involves a father engaging in painful sexual intercourse with his eight year old daughter on two occasions and threatening her with abandonment if she talks to her mother is a crime of violence that severely harmed the victim.  While the sentence certainly is severe, it is not grossly disproportionate to the gravity of the crimes. See Garcia, 2011 WL 7299662, *4-5

---

[8] The appellate court stated that the victim's foster mother "said L.H. refused to use toilet paper and had difficulty washing for months because she did not want to touch her private area.  She described how L.H. was afraid to fall asleep and still needs a light on.  She further indicated how the abuse has impacted L.H. academically, causing her to be three to four grades behind in school and to discuss the abuse in class.  L.H. struggles with her self-esteem and with understanding why this happened to her."  Lodgment 5 at 20.

[9] The Court finds that a sentence of 50-years-to-life is a severe sentence, however, the Court notes that it is not the most severe sentence as Petitioner retains the opportunity for parole.  See Solem, 463 U.S. at 297 ("Whether the opportunity for parole exists is an important factor in determining the harshness of the penalty."); Norris, 622 F.3d at 1290-91 (the possibility of parole creates a significantly less severe sentence than a sentence where parole is not a possibility); Lockyer, 538 U.S. at 74 (considering the fact that the defendant "retains the possibility of parole.").

(listing numerous cases "reject[ing] convicted child molesters' disproportionality challenges to even the most lengthy sentences").  The fact that this was Petitioner's first conviction does not undermine the validity of the court's conclusion.  Id. *5; United States v. Lamere, 337 Fed. App'x 669, 672 (9th Cir. 2009) (upholding the constitutionality of a mandatory 30 year sentence for knowingly engaging in a sexual act with a minor under the age of twelve and stating "the Supreme Court has found constitutional longer sentences for crimes of lesser gravity committed by first-time offenders.  See Harmelin, 501 U.S. at 961, 111 S.Ct. 2680; Hutto v. Davis, 454 U.S. 370, 374, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982).").

Petitioner's case is not "the rare case" in which the sentence imposed is grossly disproportionate to the crimes committed.  Accordingly, this Court concludes that the California Court of Appeal's decision was not contrary to nor an unreasonable application of clearly, established Supreme Court precedent, nor did it constitute an unreasonable factual determination. 28 U.S.C. § 2254(d).  This Court therefore **RECOMMENDS** that Ground two be **DENIED**.

## CONCLUSION AND RECOMMENDATION

In sum, this Court finds that Petitioner has failed to present any evidence suggesting that the California Court of Appeal's denial of his claims was contrary to, or an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  Nor has Petitioner made any arguments that further factual development is necessary, such that an evidentiary hearing would be warranted.  See 28 U.S.C. § 2254(e)(2) (exceptions where an evidentiary hearing may be appropriate).  As such, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgement be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any written objections to this Report must be filed with the Court and served on all parties **no later than September 26, 2104**.  The document should be captioned "Objections to Report and Recommendation."

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

2  Court and served on all parties **no later than October 17, 2014**.  The parties are advised

3  that failure to file objections within the specified time may waive the right to raise those

4  objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th

5  Cir. 1998).

6    **IT IS SO ORDERED**.

7

8  DATED:  August 28, 2014

9

10                                 BARBARA L. MAJOR

11                                 United States Magistrate Judge